**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**



LAWRENCE ROBERTS, Individually, and as
Personal Representative of the ESTATE OF
JENNIFER ROBERTS, Deceased and as
Personal Representative of the ESTATE OF
JACK L. ROBERTS, Deceased and as Next
Friend of OLIVIA ROBERTS, a Minor,

                 Plaintiffs,

v.

BENNETT ENTERPRISES, INC., and Ohio
Corporation, d/b/a/ HOLIDAY INN EXPRESS-
MONROE, and HOLIDAY HOSPITALITY
FRANCHISING, INC., a Delaware Corporation,
Jointly and Severally,

                 Defendants.

_____ /

Case Number: 04-73540

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

---

## OPINION AND ORDER DENYING DEFENDANT HOLIDAY HOSPITALITY FRANCHISING, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCK. NO. 23)

       Now before the Court is Defendant Holiday Hospitality Franchising, Inc.'s ("HHF")

Motion for Summary Judgment. The Court held a motion hearing on July 12, 2006. Having

considered the entire record, and for the reasons that follow, the Court DENIES Defendant

HHF's motion.

## I.    FACTS

       Lawrence Roberts, as a personal representative of the Estate of Jennifer Roberts and the

Estate of Jack Roberts, and Next Friend of Olivia Roberts (collectively "Plaintiffs"), filed a

1

Complaint[1] against Bennett Enterprises, Inc. ("Bennett"), doing business as Holiday Inn Express - Monroe, and HHF, alleging negligence on the part of Bennett and HHF, and intentional infliction of emotional distress.

Plaintiff Lawrence Roberts is a resident of Michigan and the personal representative of the Estate of Jennifer Roberts and the Estate of Jack Roberts. (Am. Compl. ¶¶ 1, 2). Plaintiff Olivia Roberts is a minor and a resident of Michigan. (Am. Compl. ¶ 2). Bennett is an Ohio corporation doing business as Holiday Inn Express - Monroe (the "Hotel"). (Am. Compl. ¶ 4). The Hotel is located in Michigan. (*Id.*). HHF is a Delaware corporation, with its principal place of business in Georgia. (Am. Compl. ¶ 5).

This suit arises from an incident which occurred on September 14, 2001, at the Hotel. Lawrence and Jennifer – with their four year-old daughter Olivia and ten month-old son Jack – checked into the Hotel on their way to Ohio. (Def.'s Br. 5). The family checked into adjoining rooms, one of which had an in-room Jacuzzi. (*Id.*). At approximately 7:30 p.m., Lawrence filled the tub with a few inches of water in order to clean and scrub it before use. (Pls.' Resp. 6). Lawrence then went in a bathroom adjacent to the Jacuzzi area to help his daughter finish using the toilet. (*Id*). At this time, Jennifer Roberts was attending to other matters, apparently unpacking her children's clothes in the adjacent room. (*Id.*). While Jack Roberts was unattended, he climbed the stairs to the Jacuzzi and fell into the water. Lawrence heard his son

---

[1]    Count I:       Negligence, Gross Negligence and or Wanton and Willful
                      Misconduct of Defendant Bennett Enterprises.
       Count II:      Negligence, Gross Negligence and or Wanton and Willful
                      Misconduct of Defendants Inter Continental Hotels Group PLC,
                      Six Continents PLC, and Holiday Inn Corporation
       Count III:     Negligent Infliction of Emotional Distress

2

fall into the Jacuzzi and pulled him out of the water. (*Id.*). Lawrence estimated that his son was in the water for roughly thirty seconds. (*Id.*).

The Hotel called emergency services, and Jack was rushed to the emergency room of Monroe Mercy Memorial Hospital. (Def.'s Br. 5). Jack had suffered second degree burns over eighty-five percent of his body, and Monroe Mercy Memorial Hospital was unequipped to handle his injuries. (Pls.' Resp. 7). Subsequently, Jack was airlifted to the University of Michigan Trauma Burn Center. (*Id.*). Jack died on September 17, 2006, as a result of complications from his burn injuries. (*Id.*).

A subsequent investigation of the accident concluded that the hot water tank was set at 128 degrees Fahrenheit. (*Id.*) After testing the temperature of the hot water tank during his investigation of the incident, Officer Foley turned on the water of the Jacuzzi at issue for several minutes. (Pls.' Resp. Ex. B, Monroe City Policy Dept. Incident Report 5). Officer Foley allowed the water to heat up and then placed his hand under the running water. (*Id.*) He noted that it "was slightly warmer than officer [sic] would use for bathing but was not so hot that officer's [sic] hand had to be removed due to the heat." (*Id.*) The investigation further revealed that Jack's injuries were not the result of foul play. (*Id.*).

Plaintiffs originally filed their Complaint on September 13, 2004, and their Amended Complaint on October 29, 2004. HHF filed its Motion for Summary Judgment on May 1, 2006. Plaintiffs filed their Response on May 30, 2006. HHF did not file a Reply. At the motion hearing, the Court requested that Plaintiff file a supplemental brief identifying the sections of the Standards Manual for hotel operations with which Defendant failed to comply. Plaintiffs filed the supplemental brief on July 21, 2006.

3

HHF argues that it did not own, lease, operate, control or have the right to control day-to-day operations of the Holiday Inn. HHF claims that unless the franchisor retains the right to control the day-to-day operations of the franchisee and exercises that right, no agency relationship is established; and thus, the franchisor is not liable for the negligence of a franchisee. HHF also avers that representatives of Bennett and Holiday Inn support its position that it had no day-to-day control of the Holiday Inn and did not have on-site presence. HHF relies on *Little v. Howard Johnson Co.*, 183 Mich. App. 675 (1990), *Ciofo v. Hungry Howies Pizza*, Case. Nos. 193310, 194938, 1997 WL 33347978 (Mich. Ct. App. May 16, 1997) (unpublished), and *Viches v. Allegro Resorts*, 127 F. Supp. 2d 828 (E.D. Mich. 2000).

Plaintiffs retort that this case is not about day-to-day operations of a franchise. Plaintiffs believe that HHF retained ownership and exercised control over standards, specifications, and policies for construction, furnishing, operation, appearance, and service of the hotel. Plaintiffs also assert that HHF retained ownership, control, and the right to modify any aspect of the hotel at its discretion. Plaintiffs contend that the hotel had to submit detailed proposed plans for the hotel addition, which included equipment and furnishings. Plaintiffs aver that these plans need to conform to prevailing standards set by HHF. Plaintiffs argue that HHF was in the best position to prevent this injury and was itself independently negligent for failing to maintain minimum standards and failing to require that the Hotel install anti-scalding devices in the new addition. Plaintiffs assert that HHF retained ownership and exercised control over the design of the unguarded Jacuzzi and the lack of anti-scalding devices, and the delivery of hot water directly from the hot water tanks. Plaintiffs believe that HHF was also negligent for failing to maintain minimum standards.

4

## II.    ANALYSIS

### A.    Standard of Review

A complaint brought under Federal Rule of Civil Procedure 12(b)(6) should not be dismissed for failure to state a claim, "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Hoover v. Ronwin*, 456 U.S. 558, 587, 104 S. Ct. 1989; 80 L. Ed. 2d 590 (1984). For purposes of a motion to dismiss, the pleadings and affidavits are viewed "in a light most favorable to the Plaintiff." *Niemi v. NHK Spring Co.*, 276 F. Supp. 2d 717 (E.D. Mich. 2003). All factual allegations and any inferences derived from those allegations must be accepted as true. *Cheriee Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). "If, on a [motion to dismiss] . . . , matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgement and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to represent all material made pertinent to such a motion by Rule 56. FED. R. CIV. P. 12(b).

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Of course, [the moving party] always bears the initial responsibility

5

> of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of

6

evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

"[T]he showing (whether as to standing or the merits) required to overcome a motion for summary judgment is more extensive than that required in the context of a motion to dismiss. *Id.* "The principal difference is that in the former context evidence is required, while in the latter setting the litigant may rest upon the allegations of his complaint." *Id.* (citations omitted); *see* FED. R. CIV. P. 56(e) (requiring the "nonmoving party to go beyond the pleadings."). Because HHF relies upon evidence not included in the pleadings, the Court treats Defendant's motion as a motion for summary judgment.

**B.    Discussion**

HHF argues that it did not have day-to-day control over operations and thus it is not liable for negligence. Although HHF does not apply the case law it cited to the specific facts of the case, the Court assumes that HHF's argument is that it is not involved in how the hot water heater is maintained nor at what water temperature the water heater is set. Plaintiff's respond that the hot water tanks were part of the "System," described below, and that HHF retained ownership, control, and the right to modify or alter them.

"Generally, a principal is responsible for the negligence of its agent." *Little v. Howard Johnson Co.*, 183 Mich. App. 675, 679-80 (1990). The test in Michigan for a principal-agent

7

relationship "is whether the principal has the right to control the agent." *Id.* at 680. Thus,

> a franchisor must have the right to control the day-to-day operations of a
> franchisee in order to establish an agency relationship. An agency relationship is
> not created when the franchisor only reserves the right to set standards regarding
> products and services offered by the franchisee in order to establish an agency
> relationship, and such a relationship is not created where the franchisor merely
> retains the right to set standards regarding the products and services offered by the
> franchisee, the right to regulate such items as the furnishings and advertising used
> by the franchisees, and the right to inspect for conformance with the agreement.

*Ciofo, 1997* WL 33347978, at *2 (citing *Little*, 183 Mich. App. at 680).

"Where there is a disputed question of agency, any testimony, either direct or inferential,

tending to establish agency creates a question of fact for the jury to determine." *Meretta v Peach*,

195 Mich. App. 695, 697 (1992). The apparent authority of an agent to act on behalf of the

principal is to be determined by viewing all of the facts and circumstances, and ordinarily this is

a question of fact for the jury. *Central Wholesale Co. v. Sefa*, 351 Mich. 17, 26 (1957). The

existence of a principal-agent relationship is for a jury to decide if the records is conflicting.

*Lincoln v. Fairfield-Nobel Co.*, 76 Mich. App. 514, 519 (1977).

In support of its argument, HHF relies on *Little*, *Ciofo*, and *Viche*. In *Little*, the court held

that there was no triable issue regarding defendant's right to control the day-to-day operations of

the franchisee. There, the plaintiff alleged that the defendant was vicariously liable for the

plaintiff's injuries when she slipped on a walkway that had not been cleared of ice and snow.

*Little*, 183 Mich. App. at 677. The walkway was located on the property occupied by a restaurant

franchisee. *Id.* The court concluded that the franchise agreement focused on the uniformity and

standardization of those products and services offered by the franchisor's line of restaurants. *Id.*

at 682. The *Little* court found that while the defendant retained the right to regulate such things

8

as building construction, furnishings, and equipment, it retained no control over the day-to-day operations of the restaurant or the daily maintenance – other than to require the defendant to maintain the property in an orderly and clean condition. *Id.*

In *Ciofo*, the court also held that there was no triable issue regarding defendant's right to control the day-to-day operations of the franchisee. 1997 WL 33347978 at *2. The plaintiffs in *Ciofo* were hit by a car delivering pizzas and alleged the franchisor was directly and vicariously liable for their injuries. *Id.* at *1. As in *Little*, the *Ciofo* court found that franchise agreement insured the uniformity and standardization of those products and services offered by the franchisor. *Id.* at *2. However, the court opined that those obligations did not affect the control of daily operations of a franchise. *Id.* The court ruled that though the "operations manual contained guidelines for hiring employees, the methods and details of hiring and supervising employees were controlled by [the franchisee]. *Id.*

In *Viches*, the plaintiffs were harmed by the spraying of pesticide during a hotel stay. 127 F. Supp. 2d at 829. Following *Little*, the *Viches* court also ruled that the franchise agreement in question gave the defendants control over the quality of services provided by the franchisee, but that it did not give rise to an agency relationship. *Id.* at 833.

The Court finds that the instant case is distinct from those proffered by HHF. In each of the above cases, the injury occurred while the franchisee employee carried out the franchisor's standards (*i.e.*, delivering pizzas or spraying pesticides) or failed to follow the franchisor's standards (failing to clear sidewalks of ice and snow). Here, the issue is with the actual standards set forth by the franchisor (*e.g.,* equipment, and building design and construction, and elements of the "System"), not how those standards are carried out on a day-to-day basis by a franchisee.

9

The Agreement defines the System as being "composed of elements, as designated from time to time by Licensor, designed to identify 'Holiday Inn Hotels' to the consuming public and/or to contribute to such identification and its association with quality standards." (Def.'s Br. Ex A, Agreement ¶ 1B). The System includes "standards, specifications and policies for construction, furnishing, operation, appearance and service of the Hotel." (*Id.*). Moreover, HHF has "[u]nrestricted and exclusive ownership of the System and any element(s) or component(s) thereof." (Def.'s Br. Ex. A, Agreement ¶ 7A). HHF retained control over all aspects of the Hotel structures, facilities, and equipment. (Def.'s Br. Ex. A, Agreement ¶1A).

According to the Agreement, HHF owned all aspects of the System and retained control over all aspects of the equipment. Plaintiffs argue that HHF controlled the temperature at which the hot water tanks were set. Indeed, the June 1, 2001 Holiday Inn Express standards manual requires that guest bathroom must have hot water at a maximum of 125 degrees. (Pls.' Supp. Br. Ex. A, Standards Manual IX.9). Neal Kovacik's ("Kovacik"), Vice President of Operations for Bennett, testimony also supports the argument that HHF controlled the water temperature through its Standard Manual.

> Q.    . . . Do you know whether Holiday Inn corporate ever had standards for maximum hot water temperatures in guest rooms?
> A.    I don't have any personal knowledge of that. I would imagine they probably address that somewhere in the standards honestly but I don't know that. I'm not certain. There is so much.
> Q.    They're huge manuals probably, right?
> A.    Yes.

(Pls.' Resp. Ex. E, Kovacik Dep. 8: 24-25, 9:1-7). This evidence contradicts HHF's argument that it has not control over how the hot water heater is maintained, nor at what water temperature the water heater is set. Plaintiffs argue that HHF is negligent for mandating that their hot water

10

could be as hot as 125 degrees, because water at that temperature is not fit for human contact. Plaintiffs support their argument that 125 degrees is not fit for human contact with Dr. Elaine Pomeranz, M.D.'s deposition testimony. Dr. Pomeranz testified that an infant in water of 122 degrees Fahrenheit will sustain third degree burns within twenty seconds. (Pls.' Resp. Ex. D, Pomeranz Dep. 25:12-15). The maximum water temperature that adults can tolerate in Jacuzzis and whirlpools is 108-109 degrees. (Pls.' Resp. Ex. D, Pomeranz Dep. 17:10-16). Dr. Pomeranz stated that water temperature should be set at 120 degrees or less. (Pls.' Resp. Ex. D, Pomeranz Dep. 22:14-15). "That's because between 120 degrees Fahrenheit and 130 degrees Fahrenheit there is a very sharp decrease in how long it takes to get a significant scald injury. It's not a linear relationship." (Pls.' Resp. Ex. D, Pomeranz Dep. 22:15-19). Dr. Pomeranz testified that adults will sustain third degree burns in water for twenty seconds at 131 degrees, infants will sustain second degree burns in 122 degree water at eleven seconds, and third degree burns in 122 degree water after twenty seconds. (Pls.' Resp. Ex. D, Pomeranz Dep. 25:2-15).

Because HHF controlled the temperature of the hot water, a franchisee did not have the independence to lower the temperature in the water tanks. Accordingly, the Court finds that a genuine issue of material fact exists as to whether HHF controlled the hot water tank and all aspects of the heater, including the temperature at which the hot water tank was set.

Likewise, Plaintiffs argue that the "System" also included the planning and building of the additional rooms where the accident occurred. Thus, Plaintiffs argue that HHF, because it had to approve all plans of design and layout, was also negligent. Plaintiffs claim that the plans needed to conform to the prevailing systems standards, including construction standards set forth in the Licensor's Standards Manual. Plaintiffs assert that the Jacuzzi design was flawed because

11

it had steps leading to the top of it that were too small, making it very accessible to a small child,[2] and there were no doors or barriers that would prevent access to the hot tub.  Plaintiff's assertion is supported by the drawings submitted in Plaintiff's supplemental brief, which shows stairs leading directly to the hot tub and no doors or barriers.  (Pls.' Supp. Br. Ex. B).

     Plaintiffs also suggest that HHF approved the design of the addition which did not include anti-scalding devices, though they were required by the Standards Manual.  The Standards Manual is clear that anti-scalding devices must be used in the guest rooms.  The record is unclear as to whether an anti-scalding device for the Jacuzzi at issue was in the plans approved by HHF.  However, on the issue of control, HHF controlled whether anti-scalding devices were required in the Standards Manual and had the final say regarding the design of the Hotel addition.

     The Agreement states that when a franchisee plans on building additional rooms, the:

> Licensee shall submit proposed plans, specifications, and drawings for the Addition, including its proposed equipment and furnishings with such detail and containing such information as [Defendant] may request (collectively, "Plans"). The Plans as submitted to [Defendant] shall conform to prevailing system standards, including construction standards set forth in the manual.  Construction shall not be unless and until [Defendant] has approved the Plains.  Thereafter, no change shall be made to the Plans without the advance consent of [Defendant]. . . . Licensee shall cause the Addition to be constructed according to the Plans approved by [Defendant] and [Defendant] shall determine whether construction has been completed in accordance with the Plans.

(Def.'s Br. Ex. A, Agreement ¶ 15A).  The Agreement also states that "[a]ll improvements and additions whenever made . . . shall inure to the benefit of and become the property of Licensor."  (Def.'s Br. Ex. A, Agreement ¶ 7A).  Under this Agreement, no addition could be built until every aspect of the plan was approved by HHF, and once built, it was owned by HHF –

---

[2] This was the conclusion reached by the Monroe City Police.  (Pls.' Resp. Ex. B, Monroe City Policy Dept. Incident Report 5).

including, in this case, the design and layout of the Jacuzzi and surrounding area, and the

apparent lack of any devices to prevent scalding.

> Q.    And then depending on the type of room, like Jacuzzis were added to the
>         hotel at some point?
> A.    Yes.
> Q.    Would the layout of a Jacuzzi room be included in [Holiday Inn's]
>         standards?
> A.    I believe so. We had to have, everything that we do we have to send down
>         for approval. So we would have to draw out the layout of the room and
>         send it down to approval. Whether it's included in the standards or not
>         that had to approve, you know what we did.
> Q.    So in other words, if, if Bennett wanted to reconfigure a room to be a
>         Jacuzzi, that would have to be approved by Holiday Inn corporate, the
>         layout of it?
> A.    Yes.

(Pls.' Resp. Ex. E, Kovacik Dep. 13: 10-23).

Additionally, only HHF could add, change, or take away elements of the System,

including equipment. (Def.'s Br. Ex. A, Agreement ¶ 1B) (stating that the franchisor "may add

elements to the System or modify, alter, or delete elements of the System in its sole discretion

from time to time."). As a result, a franchisee could not have added anti-scalding devices to the

plan if such devices were not included without the approval of HHF. This is because HHF had

sole discretion to modify, alter or delete elements of the system. It follows that HHF was aware

whether anti-scalding devices were required in the Standards Manual, and knew from the plans

that whether or not anti-scalding devices were used. HHF approved the plans anyway. Thus, in

a light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether HHF

retained control of the design of the additional hotel rooms, including the design of the Jacuzzi

area, and the decision to not include anti-scalding devices on the hot water heaters providing

water to the Jacuzzi.

13

While, as in *Little*, HHF retained the right to regulate such things as building construction, furnishings and equipment, and did not retain control over the day-to-day operations of the restaurant or the daily maintenance, this issue is not one of day-to-day operations, but one of equipment and building design/construction standards set forth by the franchisor. HHF retained control over these issues and, in a light most favorable to Plaintiffs, a genuine issue of material fact exists on the issue of the negligence of HHF.

## III.   CONCLUSION

Accordingly, for the reasons stated above, the Court DENIES Defendant's Motion for Summary Judgment.

**SO ORDERED**.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: 12-26-06
      Detroit, Michigan

14